UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

GAVIN/SOLMONESE LLC, Liquidating　　:
Trustee of the Waste2Energy　　　　 :
Liquidating Trust created in　　　　:
Accordance with the confirmed　　　 :
Chapter 11 Plan of Reorganization　:
for WASTE2ENERGY HOLDINGS, INC.,　 :
WASTE2ENERGY, INC., WASTE2ENERGY　 :
GROUP HOLDINGS PLC, AND　　　　　　 :
WATE2ENERGY TECHNOLOGIES　　　　　　:
INTERNATIONAL LTD.,　　　　　　　　 :
　　　　　　　　　　　Plaintiff,　　 :
　　　　　　　　　　　　　　　　　　:
　　　　- v. -　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
CHRISTOPHER D'ARNAUD-TAYLOR, PETER :
BOHAN, JOHN JOSEPH MURPHY, CHARLES :
VISTA LLC, GREGG LORENZO, AND　　　 :
FRANCIS LORENZO,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　Defendants.　 :
------------------------------------X

13-CV-6400(LAP)

OPINION AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/24/14

LORETTA A. PRESKA, Chief United States District Judge:

　　In this action, Gavin/Solmonese LLC (the "Trustee" or

"Plaintiff"), acting on behalf of the bankrupt Waste2Energy

Holdings Inc. ("W2E") and buyers of its debentures, brings

securities fraud claims pursuant to Sections 10(b) and 20(a) of

the Securities Exchange Act of 1934 ("the 1934 Act") against the

management of W2E as well as the broker-dealer it hired to

conduct a private offering, Charles Vista LLC ("Vista"). 15

U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Plaintiff also brings

related common law claims against the defendants, including

negligent misrepresentation, breach of fiduciary duty, negligent

hiring and retention, conversion, and unjust enrichment.

1

Three motions are presently before the court. Two motions to dismiss the First Amended Complaint ("FAC") for failure to state a claim have been filed by employees of W2E and by Vista employee Francis Lorenzo. In addition, Vista and its other employees have moved to compel arbitration, or, in the alternative, to dismiss. Taken together, these motions challenge all of Plaintiff's claims. For the reasons stated below, Plaintiff's securities fraud claims under Section 10(b) and 20(a) are dismissed against both the W2E and Vista defendants. Because Plaintiff's only federal claims have failed, the court declines to exercise supplemental jurisdiction over the remaining common law claims. However, Plaintiff is granted leave to supplement the complaint to plead the existence of diversity jurisdiction properly.

I.   Background

Waste2Energy Holdings Inc. is a cleantech technology company founded in 2007 to create customized facilities that generate clean renewable energy from materials typically disposed of as waste.  The company, as well as its three subsidiaries (Waste2Energy, Inc., ("Inc") Waste2Energy Group Holdings PLC, ("PLC") and Waste2Energy Technologies

2

International Ltd. ("Technologies")), will collectively be referred to as "W2E" throughout this opinion.

Christopher D'Arnaud-Taylor ("Taylor") was involved in founding W2E and during the offering period served as Chairman of the Board of W2E Holdings and W2E Inc. and in fact as its sole director for at least part of this period. (FAC ¶38) He was also the managing director of the two subsidiaries W2E Technologies and PLC, which are part of the Liquidating Trust. (FAC ¶25.) John Joseph Murphy ("Murphy") was hired as managing director of Technologies and PLC in 2008 and afterwards was responsible for managing the Dargavel Project, W2E's only project in development. (FAC ¶ 27.) Peter Bohan ("Bohan") served as CEO of both W2E Inc. and W2E Holdings during the offering period but was replaced by Murphy in May 2011 after personal differences arose between them. (FAC ¶¶27, 29.) Together, these defendants collectively are referred to as "the W2E Defendants."

Gregg Lorenzo ("G. Lorenzo") is the owner of Charles Vista, LLC, a registered broker-dealer. Francis Lorenzo ("F. Lorenzo"), who is not related to him, was the head of investment banking at Vista. Together with Charles Vista itself, these defendants comprise the "Vista defendants."

W2E initially acquired a proprietary technology for waste "gasification" by purchasing the company Enerwaste Europe Ltd. ("EE") and hiring its owner, Friofinnur Einarsson ("Finni"), as

W2E's Chief Technology Officer. In 2007, W2E was hired by Ascot Environmental Ltd. ("Ascot") to complete a waste to energy facility in Scotland called "the Dargavel Project" that EE was originally contracted to complete using its technology. (FAC ¶28.) The project was plagued by persistent problems, causing W2E to conclude that the intellectual property it had acquired was not operable, creating significant delays that put W2E in breach of its contract, and eventually leading the client to develop its own technological adaptations in order to complete the project.

The fraud and negligent misrepresentation claims in this case concern a private placement conducted by W2E between September 2009 and the middle of 2010 designed to raise up to $15 million which was imminently needed to finance the short-term operations of the company. W2E offered senior convertible debentures at a 12% interest rate, which matured a year from the date of issue. Investors also received additional warrants entitling them to buy common stock at a specified cost per share. (FAC ¶2.) W2E retained Vista to act as its exclusive placement agent for the offering. In addition to consulting and investment banking fees, Vista was to receive a commission of ten percent of the gross proceeds of the debentures sold as well as a non-accountable expense allowance of three percent of the proceeds. (FAC ¶¶36-37.) Vista's compensation would double if

4

the debenture purchasers exercised their warrants to acquire
company stock, and if $10 Million of debentures were sold, Vista
would also have the right to name a minority of new directors.
(Id. at 36, 38.)

Prospective investors were given a confidential private
offering memorandum ("POM") which described the opportunity and
identified the risk factors for the investment.  Defendants also
held live information sessions for investors. Plaintiff alleges
that the POM and information sessions contained numerous
fraudulent misrepresentations including the message that W2E had
"significant IP, valuable trade secrets and know-how to operate,
control and manage" waste gasification facilities, when in
actuality, its intellectual property was worthless and its sole
project under construction was unsuccessful and the subject of
protracted disputes. (FAC ¶4, 9.)

In August 2011, a group of investors filed a successful
petition to force W2E Holdings, Inc. into involuntary bankruptcy
pursuant to Section 303 of the Bankruptcy Code, 11 U.S.C. § 303.
(FAC ¶6.) A Chapter 11 trustee was appointed, and in early 2012
he conducted an examination of the pre-petition business
activities of W2E. Plaintiffs claim that this investigation
brought to light key facts indicating that W2E had engaged in
fraudulent misrepresentations throughout the offering period.
(See FAC ¶9.) As part of the company's liquidation plan,

5

debenture holders were given the option to assign their claims to the Liquidating Trust for prosecution, and 22 investors chose to do so. (FAC ¶18.)

In August of 2011, the SEC also launched an investigation of the Vista Defendants for the role they played as the placement agent for W2E's debentures. On February 15, 2013, the SEC issued a cease and desist order including allegations of misrepresentations made to three anonymous customers in order to induce them to purchase debentures. (FAC ¶79.)

Plaintiff also alleges that the officers and directors of W2E incompetently managed the company's affairs and, when it began to fail, seized corporate assets for themselves. However, this opinion need not go into depth about the facts underlying these claims because they are based in common law.

II.   Securities Claims

    A. Statute of Limitations

Claims brought under Section 10(b) must be brought by the earlier of "2 years after the discovery of the facts constituting the violation; or 5 years after such violation." 28 U.S.C.A, §1658(b). Plaintiff's Section 10(b) claim against the W2E defendants is time-barred because W2E investors were or

should have been aware of the key facts constituting the violation more than two years prior to the filing of this case on September 11, 2013.  The Court need not determine whether Plaintiff's Section 10(b) claim against the W2E defendants is adequately pled because it was not timely filed. See e.g. Steginsky v. Xcelera Inc., 741 F.3d 365, 369 (2d Cir. 2014), (affirming dismissal of claim as untimely even though Plaintiff's case was previously dismissed by the district court for failure to plead scienter.)

The statute of limitations begins to run when a reasonably diligent plaintiff would have discovered the facts constituting the violation. Merck & Co. v. Reynolds, 559 U.S. 633, 653 (2010).  All elements of a Section 10(b) violation must be discovered, including facts establishing a defendant's scienter. Id.  A fact is not deemed "discovered" until the Plaintiff can plead it with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss.  City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 175 (2d Cir. 2011).

While mere inquiry notice no longer triggers the statute of limitations, the Supreme Court has noted that this does not put all plaintiffs in the same position no matter when they choose to begin investigating.  Merck & Co., Inc., 559 U.S. at 652. Courts must still consider when "storm warnings" would have prompted a reasonably diligent plaintiff to begin investigating

7

in order to determine when a reasonable plaintiff would have discovered the necessary facts. Id. For instance, in a statute of limitations analysis governed by Merck, the Third Circuit has stated that a reasonably diligent plaintiff would undertake an investigation based on "'[t]he filing of related lawsuits,' 'news articles and analyst's reports,' and 'prospectuses, quarterly reports, and other information related to their investments.'" Pension Trust Fund for Operating Engineers v. Mortgage Asset Securitization Transactions, Inc., 730 F.3d 263, 276-77 (3d Cir. 2013) (quoting Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P., 435 F.3d 396, 400 (3d Cir. 2006)). The court may consider such public documents in its evaluation of a motion to dismiss. See Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc., 155 F.3d 59, 67 (2d Cir.1998) (Court may consider documents in addition to the complaint itself, including those "appended to the complaint or incorporated in the complaint by reference, as well as. . . matters of which judicial notice may be taken.")

Although the date at which discovery should have occurred can be a fact-intensive question, courts in this district often make this determination on a motion to dismiss. LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 156 (2d Cir.2003) (Where the relevant facts "can be gleaned from the complaint and papers ... integral to the complaint, resolution

of the issue on a motion to dismiss is appropriate.") (Quoting
Dodds v. Cigna Sec., Inc., 12 F.3d 346, 352 n.3 (2d Cir. 1993)).

Plaintiff argues that many of the facts set forth in the
FAC were only brought to light through the Chapter 11 Trustee's
investigation in early 2012, particularly those pertaining to
scienter.  (Pl.'s Opp. To Summ. J. at 21; FAC ¶8, 62.)
Plaintiff alleges scienter primarily based on statements by
defendants Murphy and Taylor that at the time of the offering
period, the Dargavel Plant was not in fact open, W2E did not
have valuable IP, and lacked the "know-how" and resources
successfully to create a gasification facility. (Pl.'s Opp. To
Summ. J. at 17; FAC ¶60-67.)  However, accepting all of
Plaintiff's allegations as true, a substantial portion of this
information was either known or freely available to investors
much earlier, such that the facts necessary to state this claim
should have been discovered before September 11, 2011.

For example, on October 1, 2009, in its delayed May 28,
2009 8-K SEC filing, W2E defined its IP platform as consisting
of proprietary technology, know-how and pending patents
inherited from EE (such as cBos technology which the POM claimed
would be "the primary catalyst for growth in the. . . industry
due to its. . . first-to-market advantages.") (Form 8-K of Oct.
1, 2009 at 16.) At the same time, W2E disclosed that the
"initial plans, designs, and knowhow that were the foundation of

9

the project plan" for the Dargavel plant, based on the IP
acquired from EE, was unworkable and that W2E's IP platform
would need to be rebuilt from scratch. (Id. at 24) As a
result, the IP valued on its balance sheet was written down to
zero. (Id. at F-24.) It also acknowledged that W2E had lost most
of the personnel gained from EE credited with relevant
expertise. (Id. at 24) Finally, W2E described significant
difficulties with the Dargavel Project, including doubts about
W2E's ability to complete the project, which had led to the
retention of an outside consultant, and a dispute with the
client, ASCOT, which was claiming liquidated damages against W2E
for its failure to fulfill the contract on schedule. (Id. at 29,
36.)

       These warning signs should have taken on greater
significance in the context of W2E's consistent defaults on its
debentures. The complaint does not indicate whether W2E made
scheduled interest payments to debenture holders, but the
company began defaulting on the principle amounts of the
debentures in September of 2010 and reported consistent defaults
every several weeks through January of 2011. (Forms 8-K of Sept
14, 2010 – January 13, 2011.) Ultimately, none of the
debentures was repaid. (FAC ¶108.) In Arco Capital Corp. Ltd.
v. Deutsche Bank AG, this court dismissed a 10(b)-5 claim as
untimely because a reasonable investor would have begun

investigating his or her potential claims much earlier in a
pattern of defaults. 986 F. Supp. 2d 296 (S.D.N.Y. 2013)
(Investor was on inquiry notice of its potential claim after
experiencing multiple defaults and renegotiating the terms of
its agreement.) Here a stark pattern of defaults would have been
obvious by early 2011 through the most cursory examination of
public filings.

Plaintiff argues that it was unaware until the 2012
investigation by the Trustee that W2E did not own valuable IP
developed during the construction of the Dargavel site after the
acquired IP was acknowledged worthless. (Transcript of Oral
Argument July 29, 2014, 14:1-9; FAC ¶9) (citing Taylor's
testimony that "the know-how was actually developed by the
customer [ASCOT] and [W2E was] left hoping the customer would
share it with them.") It is not clear that this statement was
substantially different from the one made by Murphy in his
September 8, 2011 declaration, which credited Ascot with
developing "hundreds of changes to the Dargavel plant, which do
not rely on the IP of W2E Tech but are uniquely necessary for
compliance with. . . regulatory requirements and productive
operation." (Regan Decl., Ex. 18 at ¶32.) However, in the
context of widespread defaults, even if investors believed that
some valuable IP was being developed, notice that W2E was
essentially starting from scratch in 2009 should have been

sufficient to prompt investigation. Facts need not perfectly match the allegations that a plaintiff chooses to include in its complaint in order for the statute of limitations to run. In re Magnum Hunter Res. Corp. Sec. Litig., No. 13-CV-2668(KBF), 2014 WL 2840152 (S.D.N.Y. June 23, 2014) (citing Freidus, 734 F.3d at 139; Staehr v. Hartford Fin. Servs. Grp., 547 F.3d 406, 427 (2d Cir.2008) (An "investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice")).

Furthermore, the August 2011 declaration by Luppino, one of the largest debenture holders, makes clear that investors were in fact already aware by that time that misrepresentations had been made to them during the sale of the debentures.  For example, while Luppino was "shown a video of what was represented to be a fully functional waste-to-energy plant built by W2E in Dargavel" in 2007, in actuality the plant "did not become mostly operational until [2011], and the plant still remain[ed] under construction four years after the presentation of the video." (Decl. of Carmelo Luppino in Supp. Of Mot. To Appoint Trustee for Debtor, August 9, 2011, Regan Decl., Ex 14 at ¶3.) Luppino had also already learned that by the time of the offering period, W2E was unable to get a performance bond to construct a plant and was not paying its subcontractors and therefore "could not possibly proceed with any construction projects." (Id at ¶ 10.)

Given this information, the debenture holders were aware or should have been aware of the key facts necessary to plead their securities fraud claims against the W2E defendants more than two years prior to the filing of this claim. However, the same cannot be said of the Vista defendants. The case against these defendants relies significantly on misconduct documented in the SEC's Cease and Desist Order dated February 15, 2013. (FAC ¶79.) As a consequence, Plaintiff's 10b-5 claim against the Vista defendants is timely.

B. Arbitration Agreement

The Vista Defendants submit that Plaintiff should be compelled to arbitrate its claims against them pursuant to the "investment account application" signed by the majority of debenture holders who assigned their claims to the Trustee. This court agrees that arbitration is obligatory for the claims of investors who signed such an agreement, but only for those who did so.

The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The Supreme Court and the Second Circuit have consistently recognized that the FAA embodies a "liberal federal policy favoring arbitration agreements."

CompuCredit Corp. v. Greenwood, 132 S.Ct. 665, 669 (2012); Scott
v. JPMorgan Chase & Co., No. 13-CV-646(KPF), 2014 WL 338753 at
*6 (S.D.N.Y. Jan. 30, 2014) (collecting cases).  In order to
determine whether or not there is a valid arbitration clause,
courts look to "(1) whether the parties have entered into a
valid agreement to arbitrate, and, if so, (2) whether the
dispute at issues comes within the scope of the agreement.  In
re Am. Exp. Fin. Advisors Sec. Litig., 672 F.3d 113, 128 (2d
Cir. 2011).

     In this case, there was a valid arbitration agreement.
Most of the investors signed an application which stated in
pertinent part, "[b]y signing below, I acknowledge that I have
received, read, understand and agree to be bound by the terms &
conditions as set forth in the Customer Agreement." (Investment
Account Applications, Cohen Decl., Ex. C.) Just above the
signature line, the form stated in block text that signers
acknowledge "that this agreement contains a predispute
arbitration clause at section 28 of page 3." (Id.) The "Customer
Agreement" that it referred to indeed contains a lengthy
arbitration clause stating that "[a]ny controversy or claim
arising out of or relating to this agreement shall be settled by
arbitration before the Financial Regulatory Authority (FINRA)."
(Customer Agreement, Cohen Decl., Ex. B, §28.B.). Plaintiff's
claims that Vista misrepresented W2E stock to investors and was
14

unjustly enriched as a result falls within the scope of this agreement, which authorized Vista to act as an agent of the investors "with respect to the purchase or sale of securities." (Id. at §2.) See Shearson/American Express v. McMahon, 482 U.S. 220 (1987) (fraud claims under Securities Exchange Act of 1934 are arbitrable pursuant to a customer agreement with a brokerage firm.)

However, Defendants have provided evidence that only eighteen of the twenty-two investors that have assigned their claims to the Trustee signed investment account applications with Vista. The claims of the remaining four customers cannot be forced into arbitration. Defendants take the position that the remaining customers can be required to arbitrate under FINRA rules because "FINRA Rule 12200 requires arbitration if the 'dispute is between a customer and member or associated person of a member; and the dispute arises in connection with the business activities of the member or the associated person." (Reply Supp. Mot. to Dismiss, at 2.) They omit the crucial first requirement that "[a]rbitration under the Code is either: (1) Required by a written agreement, or (2) Requested by the customer." (FINRA Rule 12200.) Neither is the case here.[1]

---

[1] In the case Beer v. Nutt, also cited by Defendant, arbitration was requested by the customer, not the securities dealer. No. 06-CV-9424(HB), 2007 WL 13100 (S.D.N.Y. Jan. 3, 2007).

Therefore the court must still address Plaintiff's claims against the Vista defendants.

### C. Rule 10b-5 claim against Charles-Vista Defendants

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must adequately plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Ashland Inc. v. Morgan Stanley & Co., 652 F.3d 333, 337 (2d Cir.2011) (quoting Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157, (2008)).

Plaintiffs must also meet the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b), ("PSLRA"). "The complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993) (quoting Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir.1989)). If a statement or omission is alleged based on information and belief, "the

complaint [must] state with particularity all facts on which
that belief is formed." 15 U.S.C. § 78u-4(b)(1).


### 1. No Group Pleading


As a preliminary matter, Vista defendants may not be held
liable for alleged misrepresentations made in the POM through
the group pleading doctrine. In Janus Capital Grp., Inc. v.
First Derivative Traders, the Supreme Court held that only the
"maker" of a statement may be held liable for securities fraud.
131 S. Ct. 2296, 2298 (2011) (separate entity "significantly
involved in preparing" an investment prospectus not liable for
the statements within it.) The Vista defendants are not
corporate officials of W2E, and they did not sign either of the
POMs.  See In re Smith Barney Transfer Agent Litig., 884 F.
Supp. 2d 152, 164 (S.D.N.Y. 2012) (Corporate officials who sign
documents are in ultimate control over their content and may be
held liable as a group.).  Plaintiff has plead no facts to
support an inference that Vista was the "entity with ultimate
authority over the statement, including its content and whether
and how to communicate it." Janus, 131 S.Ct. at 2302. Any role
Vista played in the drafting process or in distributing the
offering materials is insufficient to impose primary liability
under Janus. See In re Fannie Mae 2008 Sec. Litig., 891 F. Supp.

2d 458, 483 (S.D.N.Y. 2012) aff'd, 525 F. App'x 16 (2d Cir. 2013); SEC v. Tambone, 597 F.3d 436 (1st Cir.2010) ("using" a statement not equivalent to "making" a statement for purposes of a Rule 10(b)-5 claim).

Plaintiff does allege additional misstatements by the Vista defendants made to investors during the offering period both on an individual basis and at informational meetings. However, plaintiff fails sufficiently to allege reliance on these statements that could give rise to liability.

### 2. No Presumption of Reliance

To plead reliance, Plaintiff must allege that specific investors were aware of the company's misrepresentation and engaged in the relevant transaction based on that misrepresentation. In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012). Furthermore, this reliance must have been reasonable. Emergent Capital Inv. Mgmt, LLC v. Stonepath Grp, Inc. 165 F. Supp. 2d 615, 626 (S.D.N.Y. 2001). An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth. Royal American Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011, 1015-16 (2d Cir.1989).

Plaintiffs are entitled to a presumption of reliance (1) where there is an omission of material fact that a defendant had a duty to disclose, or (2) where there is "fraud-on-the-market." See Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153-54, (1972); Basic v. Levinson, 485 U.S. 224, 248 (1988) (reliance presumed where there is "fraud-on-the-market" meaning that a defendant (1) "made public" (2) "material misrepresentations" (3) about stock traded on an "impersonal, efficient market.") (quotations omitted). Neither condition applies here. The debentures were privately offered to a limited number of qualified investors and did not trade on an efficient impersonal market.

Plaintiff argues that a presumption of reliance should still be applied based on Vista's "duty to disclose", citing the Supreme Court's opinion in Affiliated Ute Citizens of Utah v. U.S., which held that a bank that solicited individual holders of a specialized security distributed to members of the Ute Tribe had a duty to disclose that they were offering to purchase shares at less than the prevailing market rate. 406 U.S. 128 (1972) (Pl.'s Opp. to Summ. J. at 7). However, the court derived this affirmative duty from the fact that the defendants were "market makers" who were both the purchasers and sellers of the relevant securities and thereby able to manipulate the price of the shares. Id. at 153. ("This being so, they possessed the

19

affirmative duty. . . to disclose.")  In the present case, Vista
was not a market maker, and the commissions that it would
receive for the debenture offering were clearly outlined in the
POM. It had no affirmative duty to disclose information
regarding the investment. See Pa. Ave. Funds v. Inyx Inc., No.
08-CV-6857(PKC), 2011 WL 2732544, at *8 (S.D.N.Y. July 5, 2011)
(Under Affiliated Ute, plaintiffs must "show[ ] that the
defendant had an obligation to disclose the information").
Furthermore, the allegations against Vista are better
characterized as affirmative misstatements rather than
omissions. (See FAC ¶¶ 79-105.)

### 3. Reliance, or Transactional Causation

To establish reliance, a plaintiff must specify what false
statements they relied on and how reliance on those specific
misrepresentations led them to engage in the relevant
transaction. Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,
133 S. Ct. 1184, 1192 (2013). Without sufficient detail
identifying who made a statement and when it was made, in
addition to who heard the statement and if and when they
subsequently invested, it is impossible for the court to
determine if Plaintiff could have relied on any of the purported
misstatements. See Prime Mover Capital Partners, L.P. v. Elixir

<u>Gaming Technologies, Inc.</u>, 793 F. Supp. 2d 651, 663 (S.D.N.Y. 2011) (Motion to dismiss granted where plaintiffs failed to plead when they purchased or sold the relevant stock). Plaintiff's claim against the Vista defendants fails because it cannot plead reliance with sufficient particularity.

Plaintiff alleges reliance on oral misstatements made by the Vista defendants during investor meetings concerning the value of the company's IP and the riskiness of the venture. Specifically, Plaintiff alleges that:

(1) Defendants showed a video that investors were led to believe was the functioning Dargavel Project, and investors were told that W2E had signed letters of intent to build multiple facilities throughout Europe. (FAC ¶53.)

(2) Gregg Lorenzo "told prospective investors, in the presence of Taylor and Bohan, that they would be able to convert their Debentures into common stock within a year and at a premium." (FAC ¶54.)

(3) Taylor, Bohan, Gregg Lorenzo, and Francis Lorenzo "had numerous communications with prospective investors, in particular with Luppino, in which they continued to represent that W2E had valuable, proprietary intellectual property conservatively worth in excess of $10 million which could easily be monetized to satisfy the Debentures." (FAC ¶55.)

(4) Bohan told investors including Mr. Savage that "repayment
    on the Debentures was supported by W2E's intellectual
    property assets" and that these assets included "tangible,
    detailed plans, specifications and engineering processes
    secured at a document storage facility." (FAC ¶56.)

(5) Gregg Lorenzo, in the presence of Taylor and Bohan, told
    investors (including Luppino and Savage) "that the POM
    overstated the negative risks and prospects for W2E and
    that its technologies and know-how were even more valuable
    than what the POM suggested." (FAC ¶57.)

The first allegation does not state which defendants were
responsible for showing the video or which investors viewed it.
The second fails to identify which prospective investors Gregg
Lorenzo spoke to. The third allegation similarly fails to
identify which defendant communicated with which investor. See
Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir.
1993) ("[plaintiffs] still have not linked the alleged
fraudulent statements to particular Directors.") The fourth and
fifth allegations suffer from a problem common to all of these
statements; they fail to provide a timeline of when the
statements were made in relation to when the particular investor
purchased securities. Prime Mover, 793 F. Supp. 2d at 663
(Plaintiff "failed to state a claim for securities fraud

because. . . the complaint fail[ed] to allege that Prime Mover
purchased or sold any EGT stock during the period in which EGT's
stock price allegedly was inflated by defendants' misstatements
and omissions.")

Plaintiff also points to findings from the SEC's
investigation as further evidence that investors detrimentally
relied on fraudulent statements by Vista. The SEC's Cease and
Desist Order does provide detailed allegations about specific
statements made by each of the defendants to investors A, B, and
C and specifies the date on which each invested and the amount
that they invested. (FAC ¶81-105.) While Plaintiff's recitation
of the misstatements made to investors A, B, and C may be
supportive of a finding of scienter for the Vista defendants, it
does not establish reliance by the investors whose claims are to
be adjudicated in this action.  Plaintiff does not allege that
investors A, B, or C are among the twenty-two investors whose
claims were assigned to the Trustee. Rather, Plaintiff attempts
to piggy-back on the SEC's detailed allegations of specific
misrepresentations made to these unnamed investors by stating
that "these same misrepresentations and/or material omissions
were previously made [sic] other prospective investors and
purchaser of the Debentures (including Luppino and Savage) by G.
Lorenzo either together with Taylor and/or Bohan or in the
presence of Taylor and Bohan and with their assent." (FAC ¶106.)

As discussed above, this fails to specify when the statements were made, which particular defendants made each statement to each investor, and when each investor purchased debentures.

### 4. Reasonable Reliance

Even if individual misstatements had been pled with greater particularity, Plaintiff would also be required to show that such reliance was reasonable. See Harsco Corp. v. Segui, 91 F.3d 337 (2d Cir. 1996). An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth. Brown v. E.F. Hutton Grp., Inc., 991 F.2d 1020, 1032 (2d Cir. 1993) (citing Royal American Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011, 1015-16 (2d Cir.1989)). Courts look to several factors in determining whether or not an investor justifiably relied on misstatements, including:

> (1) [t]he sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to

24

expedite the transaction; and (8) the generality or

specificity of the misrepresentations." Id.

In addition, courts will look to whether the offering agreement

"bespoke caution" regarding the area in which Plaintiff claims

there was a misrepresentation. Harsco Corp., 91 F.3d at 345.

Here, though some investors may have been prior customers

of Charles Vista, all investors were qualified investors, and

Vista had no fiduciary duty to them based on this transaction.[2]

Most importantly, investors could have detected misstatements by

the Vista defendants through the 'minimal diligence' of

examining contemporaneous SEC filings and the written POM

itself. (See, e.g., FAC ¶¶84, 86, 96.) (Allegations by the SEC

that alleged statements to investors A, B, and C were

contradicted by public information.)  Finally, the POM contained

sufficient cautionary language about the risks associated with

the venture to put purchasers on notice that they might lose

their investment altogether, including that the investment was

"highly speculative, involve[d] a high degree of risk and should

not be purchased by anyone who cannot afford the loss of their

---

[2] Vista acted solely as a placement agent for W2E and not as an
advisor to the investors. Broker-dealers, when operating in
arms-length transactions, do not owe their clients a fiduciary
duty. See Clarex Ltd. v. Natixis Sec. Am. LLC, No. 12-CV-
7908(PAE), 2013 WL 2631043 (S.D.N.Y. June 11, 2013); BNP Paribas
Mortgage Corp. v. Bank of Am., N.A., 866 F. Supp. 2d 257, 265
(S.D.N.Y. 2012).

entire investment." (POM of Feb. 15, 2010, FAC, Ex. B at 8.) For
example, the POM stated that the company "had significant
operating losses, an accumulated deficit. . . [did] not expect
to be profitable for at least the foreseeable future" and in
fact "may never become profitable." (Id. at 9.) It then
identified a number of specific risk factors.

Courts have generally found it unreasonable to rely on oral
statements when, as here, there is a written offering memorandum
that each investor was required to read in full before
investing. See, e.g. Brown v. Hutton, 991 F.2d at 1032
(Investors were unreasonable as a matter of law for relying on
oral statements by broker that investment was low risk rather
than the written prospectus which included the risk factors and
details of the venture.) Furthermore, the POM explicitly stated
that investors should not rely on information obtained through
individuals selling the debentures, such as the Vista
defendants.[3] Considering these factors together, it is evident

---

[3] The POM specifies that "[n]o dealer, salesman, or other person
has been authorized to give any information or make any
representation not contained in this memorandum. And, if given
or made, such information or representation must not be relied
upon as having been authorized by us." (POM of Feb. 15, 2010,
FAC, Ex. B at v.) Plaintiff argues that the POM recommends
investors ask for additional information. While it does contain
statements encouraging investors to ask follow up questions,
however, it directs them only to W2E and to information
published by the SEC, not to the Vista defendants.   (continued)

that investors would not have been reasonable in relying on the Vista defendant's alleged oral statements.

Because there is no underlying violation by the Vista defendants, there can be no control person liability for the W2E defendants. See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007) ("ATSI fails to allege any primary violation; thus, it cannot establish control person liability.")

III. Common Law Claims

Given that Plaintiff's federal claims have been dismissed, I decline to retain supplemental jurisdiction over the remaining common law claims. See Silverman v. Teamsters Local 210 Affiliated Health & Ins. Fund, 761 F.3d 277 (2d Cir. 2014)

---

(continued) (See Id. at 43) ("each prospective investor and his advisor are invited and encouraged to ask questions of the company with respect to the terms of and conditions of the offering and the business of the Company and request additional information necessary to verify information in this memorandum. The company will seek to provide answers and such information to the extent possessed or obtainable without unreasonable effort or expense. . . information relating to the company is available on the website of the SEC.") At any rate, this statement would not justify reliance on oral statements about the nature of the investment that are at odds with the written offering memorandum.

("Federal courts will normally decline to retain jurisdiction in such circumstances."); 28 U.S.C. §1367(c).

In the complaint, Plaintiff asserts that the court has both supplemental jurisdiction over its non-federal claims pursuant to 28 U.S.C. §1367(a) and diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).  To establish diversity jurisdiction, there must be complete diversity of citizenship between the Plaintiff and each of the Defendants and the amount in controversy must exceed $75,000. 28 U.S.C. § 1332(a); Cresswell v. Sullivan & Cromwell, 922 F.2d 60, 68 (2d Cir. 1990).  However, Plaintiff fails to plead the facts necessary to establish complete diversity between the parties. Federal courts are obligated to consider whether subject matter jurisdiction has been established, even _sua sponte_. Joseph v. Leavitt, 465 F.3d 87, 89 (2d Cir. 2006).

Plaintiff alleges that the defendants are citizens of New York, New Jersey, Florida, and South Carolina. (FAC ¶¶ 25, 27, 29-32.) The complaint also includes the place of incorporation of several of the corporations that are part of the Liquidating Trust (FAC ¶21, 24.) However, it does not allege their primary places of business. See 28 U.S.C. § 1332(c)(1) ("a corporation shall be deemed to be a citizen of every State. . . by which it has been incorporated and of the State. . . where it has its principal place of business.")  In addition, Plaintiff does not

allege the citizenship of the Trustee itself, Gavin/Solmonese LLC, which consists of the citizenships of all of its members. Handelsman v. Bedford Vill. Assocs. Ltd. P'ship, 213 F.3d 48, 51-52 (2d Cir. 2000).

Generally, when claims are assigned to a trust, the relevant citizenship for the purposes of 28 U.S.C. § 1332(a) is that of the trustee rather than the beneficiaries. Grede v. Bank of New York Mellon, 598 F.3d 899, 901 (7th Cir. 2010) (citing Navarro Savings Association v. Lee, 446 U.S. 458, (1980)). In Bush v. Elliott, the Supreme Court established a special rule for trustees appointed under the Bankruptcy Act of 1898, 11 U.S.C. § 46, that the citizenship of the bankrupt would be considered for the purposes of diversity jurisdiction rather than that of the trustee. 202 U.S. 477 (1906). See also Clarkson Co. v. Shaheen, 544 F.2d 624, 627 (2d Cir. 1976). However, following the repeal of the statutory basis for the decision in 1978, the status of this rule has been uncertain. See, e.g. Pupo v. Chadwick's of Boston, Inc., No. 03-CV-564(PKC), 2004 WL 2480399 at *3 (S.D.N.Y. Nov. 4, 2004) (arguing that it is generally appropriate to look to the citizenship of the bankrupt party rather than a Chapter 11 trustee); In re Litig. Trust of MDIP, Inc., No. CIV.A. 03-779(GMS), 2005 WL 1242157 at *4 (D. Del. May 25, 2005) (noting that the rule now "rests on a shaky foundation" and declining to apply it.) The

outcome may also depend on the specific powers of the trustee.
See, In re Litig. Trust of MDIP, Inc., 2005 WL 1242157 at *4
(noting that even if the Bush rule were in effect, it might not
apply to litigation trust with "sole purpose [ ] to liquidate
and distribute" Plaintiff's assets for the benefit of
creditors.)

In this case, however, the Trustee is representing not just
the claims of the bankrupt corporations but also the debenture
holders who have assigned their claims to the Trust for
prosecution. (FAC ¶¶ 18.) In that capacity, it is not clear that
the special reasoning relating to a bankruptcy relationship is
applicable at all. See, e.g. Grede v. Bank of New York Mellon,
598 F.3d 899, 900 (7th Cir. 2010) (utilizing citizenship of
trustee in case where investors had assigned their claims to
liquidation trust for collection pursuant to a Chapter 11
reorganization plan.) Thus, Plaintiff must plead the citizenship
of the Trustee in order to establish diversity jurisdiction.


IV.  Leave to Replead


Leave to amend the complaint may be granted at the
discretion of the court. American Stock Exch., LLC v. Mopex,
Inc., 230 F.Supp.2d 333, 335 (S.D.N.Y.2002). While the
opportunity to amend the complaint should be "freely given when

justice so requires," Fed.R.Civ.P. 15(a), it may be denied where
it "is unlikely to be productive." Lucente v. IBM Corp., 310
F.3d 243, 258 (2d Cir.2002). Given that Plaintiff has already
amended the complaint in response to a motion to dismiss that
challenged the element of reliance and acknowledged at oral
argument that it did not possess additional facts ready to
supplement this area, Plaintiff will not be permitted to replead
its federal claims. (See Transcript of Oral Argument July 29,
2014, 23:18-20; Mem. Supp. Mot. to Compel Arbitration or Dismiss
at 20-22.) However, Plaintiff has leave to supplement the
complaint exclusively for the purpose of establishing diversity
jurisdiction over the non-federal claims.


V.   Conclusion


     For the reasons discussed above, the motion by the Vista
defendants to compel arbitration [dkt. no. 60] is granted with
respect to the claims of those investors who both assigned their
claims to the Liquidating Trustee and signed written agreements
including an arbitration clause.[4]  The claims under Section 10(b)

---

[4] These investors include Renald and Catherine Anelle, Steven
Benkovsky, Robert William Downes, Mark Feingold, Richard
Fightlin, Wilma and Dhanraj Goolcharan, Steven Lamm, Michael and
Alexx LeVasseur, Robert A. Loeser, Charles Lowden, Luppino
Landscaping LLC, Mark Nuell, Darryl Persad, Andrew (continued)

and 20(a) of the 1934 Act against the W2E defendants and those
against the Vista defendants assigned from investors not covered
by the arbitration clause are dismissed.[5] The remaining non-
federal claims are dismissed for lack of jurisdiction but will
be considered if Plaintiff submits additional facts establishing
complete diversity between the parties.


SO ORDERED.

Dated:     New York, New York
           December 23, 2014


                                _____
                                LORETTA A. PRESKA
                                Chief United States District Judge


_____

(continued) and Kim Savage, William Simmelink, Richard Smee,
Wade Walter, and Ralph Wood.
[5]  Defendants have not produced investment account applications
for four of the investors listed in Plaintiff's schedule of
debenture holders who opted to assign their claims to the
Trustee. These investors are CMS Limited (Rodney Heathers),
David E. Gibbs, Jr., Robert and Ann Henderson, and Wayne Latchu.
(Investment Account Applications, Cohen Decl., Ex. C; FAC Ex.
A.)